Case: 2-25-cv-12417
Assigned To : McMillion, Brandy R.
Referral Judge: Stafford, Elizabeth A.
Assign. Date : 8/5/2025
Description: CMP RAMZU YUNUS
V. CITY OF DETROIT ET AL (JB)

42

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Ramzu Yunus, individually and on behalf of all others similarly situated,
Plaintiff,

v.

City of Detroit; Detroit Land Bank Authority; Wayne County Treasurer; Detroit Police
Department; and John Does 1–50,
Defendants.

CLASS ACTION COMPLAINT

**PRELIMINARY STATEMENT**

1. This action seeks redress for egregious and ongoing violations of constitutional and
international human rights committed against predominantly Black and low-income
residents of Detroit. These violations arise from systematic overassessment of property
taxes, illegal evictions, water shutoffs, retaliatory policing, and disinformation campaigns
meant to suppress political advocacy for housing justice and self-determination.

2. Detroit's government, through a coordinated pattern of discrimination and abuse, has
disenfranchised and displaced tens of thousands of residents. By leveraging inflated
assessments and unlawful enforcement mechanisms, the City has contributed to one of
the most severe humanitarian crises in urban America.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action
arises under the U.S. Constitution, federal statutes, and international treaties ratified by
the United States.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the events and
omissions giving rise to the claims occurred in the Eastern District of Michigan.

**PARTIES**

5. Plaintiff Ramzu Yunus is a resident of Detroit, Michigan, and a representative of the
human rights organization Human Rights Policy Officers. He brings this action on behalf
of himself and all similarly situated residents who were subjected to the unlawful acts
described herein.

6. Defendants include the City of Detroit, the Detroit Land Bank Authority, the Wayne
County Treasurer, the Detroit Police Department, and unknown individuals (John Does
1–50), all of whom acted under color of law.

**CLASS ALLEGATIONS**

7. Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

'All current or former residents of Detroit, Michigan, from 2009 to present, who experienced housing loss, eviction, utility shutoff, or obstruction as a result of: (1) unlawful or inflated property tax assessments; (2) landlord evictions based on passed-through unlawful taxes; (3) police participation in evictions not supported by lawful orders; (4) selective enforcement of property rehabilitation rules; (5) inflated and unaffordable water bills and inhumane water shutoffs; (6) disinformation campaign stating the gaining of housing via asserting the right of self-determination was a scam, causing nonparticipation; and (7) retaliation for political advocacy related to housing justice and the right of self-determination.'

8. Numerosity: The proposed class includes thousands of individuals and joinder is impractical.

9. Commonality: Common legal and factual questions include whether the City unlawfully overassessed property taxes and conducted retaliatory housing enforcement.

10. Typicality: Plaintiff's claims are typical of other class members, as he has been subject to the same practices and policies.

11. Adequacy: Plaintiff will fairly and adequately protect the interests of the class and has no conflicts of interest.

12. Predominance/Superiority: Common issues predominate over individual ones. Class litigation is superior to individual suits.

**FACTUAL ALLEGATIONS**

13. The City of Detroit and Wayne County implemented inflated property tax assessments from 2009 to 2016, in violation of Michigan's constitutional limitation on assessments exceeding 50% of market value.

14. A 2017 audit and reporting by the Detroit News revealed that over $600 million in unlawful taxes were levied during this period, primarily affecting Black homeowners.

15. These illegal assessments led to tens of thousands of foreclosures, disproportionately displacing Detroit's African American population.

16. Many of these homes were transferred to the Detroit Land Bank Authority, which then selectively enforced property codes, further dispossessing residents.

17. Landlords passed these unlawful taxes to tenants via inflated rents, causing widespread evictions of low-income residents.

18. The Detroit Police Department executed evictions without lawful court orders, violating residents' due process rights.

19. The City and the Detroit Water and Sewerage Department imposed inflated water rates and conducted shutoffs without notice or hearing, violating the human right to water.

20. International bodies including the United Nations have condemned these practices as human rights violations.

21. Residents advocating for self-determination and the Detroit Free Housing Program were labeled scammers and targeted with retaliatory enforcement.

22. Plaintiff and others were denied housing, threatened with police action, and subjected to media disinformation campaigns as political punishment.

**CAUSES OF ACTION**
COUNT I – VIOLATION OF DUE PROCESS (14TH AMENDMENT, 42 U.S.C. § 1983)

23. Defendants deprived Plaintiffs of property, housing, and utilities without notice or lawful process in violation of the Fourteenth Amendment.

COUNT II – VIOLATION OF EQUAL PROTECTION (14TH AMENDMENT)

24. Defendants targeted Black and low-income residents for eviction, foreclosure, and utility shutoffs, constituting discriminatory enforcement of laws.

COUNT III – FIRST AMENDMENT RETALIATION

25. Defendants retaliated against residents for engaging in protected speech and political activity advocating for housing justice and self-determination.

COUNT IV – UNJUST ENRICHMENT

26. Defendants benefited financially from unlawful seizures, utility shutoffs, and overtaxation at the expense of Plaintiff and the class.

COUNT V – VIOLATION OF INTERNATIONAL LAW (ICCPR, RIGHT TO WATER AND HOUSING)

27. Defendants violated internationally recognized rights to housing, water, and political participation under the International Covenant on Civil and Political Rights and related instruments.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Certify this case as a class action;

2. Declare Defendants' actions unconstitutional and unlawful;

3. Order immediate injunctive relief to stop evictions, shutoffs, and retaliatory practices;

4. Award compensatory and punitive damages;

5. Mandate restitution and creation of a right-of-return program;

6. Permit Human Rights Policy Officers to implement the Detroit Free Housing Program;

7. Order publication of retractions and corrections of official disinformation;

8. Mandate structural reforms including independent oversight and reparative investment;

9. Award reasonable attorneys' fees and litigation costs;

10. Grant any other relief the Court deems just and proper.


Dated: August 5, 2025


Respectfully submitted,


Ramzu Yunus
Pro Se Plaintiff
20177 Washburn Street
Detroit, MI 48221
Phone: 313.293.7577
Email: ramzu@protonmail.com

## ENDNOTES

1. Christine MacDonald & Mark Betancourt, 'Detroit overtaxed homeowners $600 million, analysis shows,' Detroit News (Jan. 30, 2017).

2. UN General Assembly Resolution 64/292, The human right to water and sanitation (July 28, 2010).

3. Goldberg v. Kelly, 397 U.S. 254 (1970).

4. International Covenant on Civil and Political Rights (ICCPR), adopted by UN General Assembly resolution 2200A (XXI), ratified by the U.S. in 1992.

5. ACLU Michigan, 'The Great Equalizer: Ending Systemic Racism in Michigan's Tax Foreclosure Crisis' (2020).

## Exhibit A - Detroit Property Tax Over-Assessment Audit

This exhibit includes documentation and summaries related to the City of Detroit's over-assessment of property taxes from 2010 to 2016, which resulted in Detroit homeowners being collectively overcharged by an estimated $600 million.

These over-assessments disproportionately affected low-income and Afrodescendant residents, contributing directly to mass tax foreclosures and displacement. The findings have been confirmed by independent audits and reported by multiple credible sources.

Sources included in this exhibit:

1. BridgeDetroit: Summary of forensic audit of the Detroit Assessor's Office.

2. Citizens Research Council of Michigan: Analysis of the assessment process and racial impact.

3. Michigan Public (NPR): Reporting on the legal and human impact of the over-taxation.

These materials support the claim of irreparable harm caused by unlawful housing practices by the City of Detroit and justify emergency injunctive relief.

**Key Sources:**

- BridgeDetroit: 'Audit finds decade of dysfunction in Detroit assessor's office'
  https://www.bridgedetroit.com/audit-finds-decade-of-dysfunction-in-detroit-assessors-office/

- Citizens Research Council of Michigan: 'Tackling Detroit's Over-Assessment Problem'
  https://crcmich.org/tackling-detroits-over-assessment-problem

- Michigan Public (NPR): 'Detroit faces reckoning, lawsuit from over-taxed homeowners'

https://www.michiganpublic.org/politics-government/2020-02-14/detroit-faces-reckoning-lawsuit-from-over-taxed-homeowners



**CITY OF
DETROIT**

An official website of the City of Detroit.
Here's how you know

Language ▾

Search

**Where am I:**  Home  ›  City Events
›  Zoom Press Conference: On Cash Compensation & Property Tax Credits For
Overtaxed Detroit Homeowners

# Zoom Press Conference: On Cash Compensation & Property Tax Credits for overtaxed Detroit homeowners

| Oct 06 | **City Council President, District 5** |
|---|---|

**2022**  🕐 **11:00 AM**

Zoom Press Conference: On Cash Compensation &
Property Tax Credits for overtaxed Detroit homeowners

Join Congresswoman Rashhida Tlaib, Senator Stephanie
Chang, and Council President Mary Sheffield for a zoom
press conference on the fight for cash compensation &



**CIVIC AND COMMUNITY INFORMATION**

# Audit finds decade of dysfunction in Detroit assessor's office

 by **Malachi Barrett**
July 25, 2022 7:00 am



A home in Detroit's Islandview neighborhood displays a sign photographed on April 27, 2022. (BridgeDetroit Photo by Malachi Barrett)

A **new independent audit** of Detroit's **troubled residential property tax assessments** found the assessor's office struggled over a decade with chronic staffing shortages, failed to maintain accurate records and left $12 million of its budget unspent.

Stout Risius Ross, LLC was hired in 2020 by the city to perform a **forensic analysis** of residential property assessments and internal operations in the Office of the Assessor between 2010 and the end of 2020. The report, presented Wednesday to the **Detroit City Council's Budget, Finance and Audit Committee,** found Detroit can't prove the accuracy of assessments that determined Detroiters' tax bills from 2010-16.

Detroit Auditor General Mark Lockridge said the city council requested the audit after it was discovered that Detroiters were overtaxed by an estimated **$600 million** from 2010 to 2016. Stout was asked to expand the scope of its audit to determine whether changes made after a 2017 citywide reassessment resolved these issues. The Office of the Inspector General is also planning a follow-up audit on Detroit assessments.

**Related:**

- **Rule breaking landlords could evict thousands of tenants**
- **Detroiters can avoid foreclosure, bring down property tax debt with these resources**
- **Complaints allege majority-Black, Hispanic cities overasses homeowners**
- **Detroit studies plan to reduce the fiscal 'penalty' of residency**

Raymond Roth, a Royal Oak-based CPA for Stout who authored the audit report, said the city has shown "undoubtedly marked improvement from the dark ages of prior to 2017," but there remains "critical areas where improvement is needed." He also expressed concern that Detroit Assessor/Deputy CFO Alvin Horhn didn't seem to take some of his recommendations to heart.

"While I may not agree with all the conclusions they've come to, I certainly understand the need for a constructive, and at times critical, eye of operations that (the City Council) has," Horhn said Wednesday. "I do believe there are challenges as far as staffing, as far as budget, as far as our way of implementing new technology that we are in desperate need of. I will also say that the Office of the CFO has taken every effort to provide the assessor's office with the resources they need to perform the job as required."

Horhn described problems with the assessor's office as a symptom of the city's 2013 bankruptcy. Horhn said there's since been a "sea change" of improvements but he also acknowledged there's still work to be done.

"There's no systemic problem with the assessment rolls in the city, and I will say that to my last day – I will bet my pension and retirement on it," Horhn said. "Are there issues? Yes, I would be lying to you if I said there weren't, but they are manageable issues."

"This office is well-equipped to do the job that's needed," Horhn added.

8/5/2025, 9:45 AM

Case 2:25-cv-12437-BRM-EAS  ECF No. 1, PageID.10  Filed 08/05/25  Page 10 of 42

**Documents 'unavailable'**

District 6 Council Member Gabriela Santiago-Romero said the audit findings are difficult to hear, since thousands of Detroiters have lost their homes due to tax foreclosure. From 2005 to 2015, **nearly half of all residential properties** in the city experienced mortgage or tax foreclosure, and **research from 2019** asserted 10% of all foreclosures since 2009 were due to "illegally inflated tax assessments."

Roth's data suggests assessed values exceeded true cash values from 2010 to 2016. State law requires property assessments to stay below 50% of the property's estimated selling price. BridgeDetroit called Roth on Friday to ask whether his investigation found evidence to suggest illegal overassessments, but Roth said it was outside the audit's scope.

Detroiters and housing stability advocates have shown up in force at council meetings throughout the summer to demand some form of restitution for their overpayments. Council Member Fred Durhal III, who represents District 7, said the council has received numerous inquiries about incorrect property tax assessments.

"We want to ensure that we are doing everything in our power to provide the resources that are needed to ensure our residents are assessed properly," Durhal said Wednesday.

Detroit's prior council in late 2020 narrowly **rejected** a plan from Duggan's administration that would have provided certain preferences including home-buying discounts and job opportunities to residents who were overtaxed between 2010 and 2013. But some council members argued the proposal didn't go far enough.

Council members this spring **adopted a budget plan** that appropriated $2 million toward a program meant to support residents overtaxed in the years following the Great Recession, with a request to bolster the program with $4 million more in federal dollars.

Organizations like The Coalition for Property Tax Justice have **continued to argue** that the lowest-valued homes in Detroit are over assessed, despite a citywide property reappraisal completed in 2017.

A **2011 performance audit** by Detroit's Office of the Auditor General found problems with assessing activities, data management, internal controls, safeguarding public property, complying with record retention policies, improper accounting and other issues. Three years later, the State Tax Commission notified the city it needed to address the problems and a corrective action plan was created in March 2014.

Roth said Detroit "is unable to support any conclusion on value it made for a single residential property" from 2010 to 2016.

Case 2:25-cv-12417-BRM-EAS   ECF No. 1,  PageID.11   Filed 08/05/25   Page 11 of 42

"There are simply not any records of what was done or how it was done, or even what the final value was on a per parcel basis," Roth said Wednesday.

The city, with oversight of the state, completed a citywide reappraisal in 2017, the first of its kind in 60 years. The reappraisal resulted in a slight reduction of property tax assessments for 53% of property owners and a slight increase in property tax assessments for 41% of property owners. It also contributed to a lower rate of tax delinquency.

Stout's audit determined the city's assessments division made "noticeable improvements" with technology and staffing since 2017, but also found the city did not maintain documentation to support its property assessments and failed to meet some of the criteria outlined by the state for an effective assessment system.

---

### Observation 7 – The Office of the Assessor has not Preserved Key Supporting Documentation for Certified Assessed Values                **STOUT**

#### Comparison of Assessment Roll to Certified Values

| Year | Assessed Value Per Assessment Roll | Certified Assessed Value | Difference |
|---|---|---|---|
| 2010 | $ 10,105,932,976 | $ 10,167,831,845 | $ (61,898,869) |
| 2011 | 9,219,284,281 | 9,263,215,626 | (43,931,345) |
| 2012 | 8,318,050,345 | 8,318,047,508 | 2,837 |
| 2013 | 6,429,437,385 | 7,542,529,886 | (1,113,092,501) |
| 2014 | 6,429,437,385 | 6,471,355,590 | (41,918,205) |
| 2015 | 6,196,869,346 | 6,234,348,714 | (37,479,368) |
| 2016 | 5,788,057,829 | 5,831,338,229 | (43,280,400) |
| 2017 | 5,939,559,021 | 5,939,261,821 | 297,200 |
| 2018 | 6,480,592,374 | 6,500,427,800 | (19,835,426) |
| 2019 | 8,966,966,092 | 8,966,965,592 | 500 |
| 2020 | $ 10,040,960,617 | $ 10,040,810,517 | $ 150,100 |
| **2010 - 2016 Pre-Reassessment Average** | | | $ (191,656,836) |
| **2017-2020 Post- Reassessment Average** | | | (4,846,907) |
| **2010-2020 Full Period Average** | | | $ (123,725,952) |

(Source: Stout Risius Ross, LLC)

The Stout audit is divided into two periods, pre-reappraisal from 2010 to 2016 and post-reappraisal from 2017 to 2020.

Stout found Detroit is unable to support any property valuations between 2010 and 2016 because the city didn't maintain certain documents. Data provided to Stout did not match data certified by the State Tax Commission during that time period, according to the audit, and the city did not provide records to verify a

reason for the differences.

The Stout report found many documents before 2016 were unavailable, but it's unclear whether documentation never existed or was lost due to poor records-keeping practices. In one example, Stout was not provided per parcel data for the entire year of 2014. The city also couldn't provide some requested documents after 2017, and Roth found discrepancies with assessments reported by the city from 2017 to 2020.

The audit also found the assessments division didn't spend an average of 20% of its budget between 2010 and 2016, for a total of $8.8 million. A third of the budget wasn't spent in 2016. More of the office's budget was used from 2017 to 2020, but Stout found a total of $3.3 million was left on the table over that period.

## Observation 1 – The Office of the Assessor Had Not Fully Used its Available Budget ✦ STOUT

### Comparison of Office of Assessor's Budget to Actual Expenditures

| Year | Budgeted FTEs | Budget | Actual | Available Budget Not Used | % of Budget Not Used | Budget Per FTE | Additional FTEs in Unused Budget |
|------|---------------|--------|--------|---------------------------|----------------------|----------------|----------------------------------|
| 2010 | 61 | $ 6,951,937 | $ 5,469,935 | $ 1,482,002 | 21.3% | $ 113,966 | 13 |
| 2011 | 56 | 6,965,395 | 6,006,760 | 958,635 | 13.8% | 124,382 | 7 |
| 2012 | 53 | 6,786,040 | 5,317,696 | 1,468,344 | 21.6% | 128,038 | 11 |
| 2013 | 48 | 6,535,083 | 6,219,946 | 315,137 | 4.8% | 136,148 | 2 |
| 2014 | 48 | 6,880,463 | 4,878,919 | 2,001,544 | 29.1% | 143,343 | 13 |
| 2015 | 44 | 5,175,404 | 4,293,219 | 882,185 | 17.0% | 117,623 | 7 |
| 2016 | 44 | 5,167,294 | 3,448,708 | 1,718,586 | 33.3% | 117,439 | 14 |
| 2017 | 45 | 6,414,370 | 5,291,022 | 1,123,348 | 17.5% | 142,542 | 7 |
| 2018 | 56 | 7,026,239 | 5,983,673 | 1,042,566 | 14.8% | 125,469 | 8 |
| 2019 | 60 | 6,880,116 | 6,563,067 | 317,049 | 4.6% | 114,669 | 2 |
| 2020 | 60 | $ 7,101,003 | $ 6,324,037 | $ 776,966 | 10.9% | $ 118,350 | 6 |
| 2010-2016 | | Pre-Reassessment Average | | | 20.1% | | 10 |
| 2017-2020 | | Post-Reassessment Average | | | 12.0% | | 6 |
| 2010-2020 | | Full Audit Period Average | | | 17.2% | | 8 |

(Source: Stout Risius Ross, LLC)

## 'Constantly in crisis mode'

Unused funds could have supported the hiring of 10 additional staff from 2010-16 and six staff from 2017-20, according to the audit. Stout found the assessments division was understaffed by at least 50%. Detroit assessors are responsible for 7,000 to 9,000 parcels per employee, well below the state recommendation of 1,500 to 3,500 parcels per employee.

Understaffing was a major problem reported by employees Roth interviewed for the audit. The assessment division increased its headcount by 25% from 2016 to 2020 and nearly doubled the number of appraisers. However, employees still reported concerns with insufficient staffing, and Roth recommended improvements to recruitment and retention.

Assessors told Stout they are overworked – one employee said assessors often need to put in 80 hours per week to complete their assignments. Employees reported an "all hands on deck" environment where employees are reassigned to help meet state mandated deadlines, putting them behind on progress towards their own deadlines.

"The understaffing concern is important, as without adequate staffing, corners need to be cut, errors are made, judgment calls are needed," Roth said. "You get into this mentality where you are constantly in crisis mode, and it's just simply not a sustainable position."

Roth said Horhn does not see an issue with understaffing, which Roth called "problematic for a variety of reasons."

Horhn told the City Council on Wednesday that hiring an "army of appraisers" wouldn't make the assessment division more efficient. He said there are 63 full-time staff in the assessor's office.

"I believe that is a solid number," Horhn said. "It allows us to do what we need to do. But it also means that we have to be very strategic in our operations."

The Stout report described a circular pattern threatening the assessment division's ability to effectively function: A large staff is needed to keep pace with the city's large property base but understaffing adds stress to the work environment and new staff can't be quickly trained to relieve that stress, leading employees to burn out and find a job elsewhere.

City employees interviewed for the audit also said staff are reassigned to "special projects" from the Mayor's Office and City Council, which adds to their workload.

"I'm trying to tread very, very carefully here, but I think this is hard for anyone to bring up and if not an independent consultant, then I don't know who else to address this," Roth told council members. "I do think that these requests can sometimes put the deputy CFO and assessor in a difficult position. It's my opinion that (Horhn's) political survival is dependent on being amenable to these types of requests … I'm hearing from the top 'we're strategic and we're getting all the important stuff done.' But from the people in the trenches, I hear 'we are drowning.'"

**'Difficult to calculate'**

The Stout audit notes "significant changes" were made to property records and internal operations after the citywide reappraisal was completed in 2017.

The city contracted with an aerial imaging company that allows appraisers to review three times as many properties from their computer as opposed to visiting each location. While this saves time, the audit states aerial reviews increase the chance of overassessment in the lowest value properties. Horhn said the technology is vital to help assessors review the condition of properties, but in-person visits are used to evaluate older homes.

The report acknowledges Michigan's largest city faces challenges due to the size and the age of its housing stock; the average year a home was built in Detroit was 1939, compared to between 1972 and 1991 in the surrounding region.

"The average age for home in the city of Detroit is over 80; it makes it difficult to calculate the condition of the property," Horhn said. "Many of the houses in this home in the city are not very well maintained. It makes it even more difficult to calculate those things."

Stout also recommended a new land study of vacant land to confirm those parcels remain vacant. More than 45,000 parcels were identified as vacant land after the 2017 reappraisal, a 60% increase. Roth said he's started to analyze a sample of parcels, and his preliminary work suggests "significant errors" with the data.

## Susanne Abraham-Elromh
July 26, 2022 9:43 am at 9:43 am

In my opinion, I always believed the City of Detroit was over assessing their residents. After Mayor Dugan came into office and had properties reassessed everything changed for the better. If they cannot repay us for all those years of overpayment on our property taxes then our current property taxes should be reduced to compensate us for their short fall.

## ROBERT L HALL
December 17, 2022 7:55 pm at 7:55 pm

why after paying my property tax do i end up receiving a bill to pay more?

© 2025 BridgeDetroit

Powered by Newspack



**GET INVOLVED**

# Tackling Detroit's Over-Assessment Problem

In a nutshell

- The Detroit property assessor's office failed to accurately reflect declining property valuations in the years following the Great Recession, causing many residential properties to be over-assessed and creating a financial strain for many property owners in the city.
- Of the estimated $600 million that Detroiter's were overtaxed, about 48 percent is tied to taxes levied by the city while the remaining 52 percent is related to overlapping levies.
- While reformers must continue to monitor the city's assessment efforts, there is the question of refunding taxes to those that overpaid. Tackling this challenge, however, presents three significant obstacles.

Prior to the COVID-19 pandemic, one of the most talked about issues in Detroit was the reported over-assessment of properties. The City of Detroit is estimated to have overtaxed homeowners by at least $600 million over a six year period following the Great Recession. The urgency of finding some sort of remediation for the over-assessed properties has somewhat faded away with the new problems ushered in from the pandemic. Finding a remedy for overtaxed residents is the goal but achieving that goal will be extremely difficult as a number of obstacles exist in the many paths leading to this goal.

## Background

Detroiters are both overtaxed and extremely poor relative to other large cities. Detroiters pay one of the highest effective homestead property tax rates among the 50 largest U.S. cities and also a large concentration of residents living in poverty. Property tax revenues pay for public safety, infrastructure, libraries, garbage pickup, and other municipal services. But, city residents also pay property taxes to support other services, delivered by overlapping taxing jurisdictions responsible for K-12 education, community colleges, a variety of Wayne County services, and many regional services, such as the Detroit Institute of Arts, metropolitan parks, and the Detroit Zoo.

Detroit's residential over-assessment problem occurred when the city did not adjust property assessments in the years following the Great Recession. The subprime mortgage crisis along with the Great Recession dragged down home values substantially, but city assessments failed to accurately reflect these fallen values. As a result, for a number of years property values were over-assessed and this was most pronounced among lower-valued homes. This created a financial strain for city residents, especially for those least able to keep up with their tax bills.

When property taxes are not paid, the debt gets passed on to Wayne County for collection. The Wayne County Treasurer reimburses the city for unpaid taxes and then attempts to collect from property owners, adding an 18 percent surcharge to residents' unpaid tax bills each year taxes go unpaid. After three years, state law requires the County Treasurer to foreclose on a property and put it up for auction where it is sold to the highest bidder.

## Detroit's Over-Assessment Problem

A 2020 report charged the city with overtaxing property owners by an estimated $600 million from 2010 to 2016. The $600 million

Array

     



CITIZENS
OF MICHIGAN

assessments put extra burden on property owners and put thousands of Detroiters at risk of unjust foreclosure.

The study estimates that of more than 63,000 Detroit homes with delinquent debt, more than 90 percent were overtaxed by an average of at least $3,700 between 2010 and 2016. In recent years, tax foreclosures of owner-occupied homes in Detroit have dropped 89 percent, falling from 6,408 foreclosures in 2015 to 708 foreclosures in 2018. In 2020, with the COVID-19 pandemic raging and causing all kinds of financial disruptions, Wayne County ceased its foreclosure activity and extended the moratorium through 2021.

Estimates are that one in ten Detroit tax foreclosures between 2011 and 2015 were caused by the city's inflated property assessments. Wayne County foreclosed on about 100,000 Detroit properties for unpaid property taxes during this period. Of 173,000 Detroit homes reviewed by The Detroit News, more than 92 percent (159,160 homes) were over assessed between 2010 and 2016. Nearly 96,000 of those properties were taxed twice as much as they should have in at least one of those years. Of the over-assessed homes, about 79,000 have had the same owner since 2010, meaning they bore the full brunt of over taxation during this period. An estimated 59,000 overtaxed properties still owe back taxes, amounting to $153 million with interest and fees.

Thousands of other Detroit homes without delinquent debt, as well as commercial and industrial properties, were unaccounted for in the analysis of the $600 million over-assessment. This means there are thousands of other Detroit homes which also suffered the same burden of having their property over-assessed and paying inflated property tax bills.

### Distribution of the Tax Revenues

Of the 69.6 mills (one mill is equal to $1 of tax for every $1,000 of assessed value) Detroit residents pay on homestead property, roughly 34 mills (48 percent) relate specifically to Detroit municipal operations, debt service, and the library. The other 52 percent is for non-city services, that is government operations outside the city, namely Wayne County and its various subunits (Zoological Authority, DIA), Wayne RESA, Wayne County Community College, the Detroit schools debt, and the state education tax.

The chart below breaks down the distribution of the $600 million of over assessed property tax revenue collected from Detroit homeowners.

## Detroit Over-Assessed Property Tax Revenue by Taxing Jurisdiction



Source: Detroit OCFO Treasury Office

## The Challenges of Remediation



Array






First, the city would need to conduct a "forensic" assessment to identify the properties affected by the overassessment and identify the value of that mistake. This would include not only the properties in arrears on property taxes, but all properties: residential, commercial, and industrial. The problem is that the over assessment appears to have been citywide, leaving few properties to benchmark against. Retrospectively identifying the market value of each property a decade ago may be impossible at this point.

Second, the city would have to track down the property owners affected by the over assessment. Some may continue to own their properties, but as was chronicled above, many lost their properties because of foreclosure or were taxed out of their homes. Some may have relocated within the city, while many have located elsewhere.

Finally, there is the question of where the money will come from to compensate affected property owners. Should it fall completely on the city, even though entities other than the city received a windfall but did not contribute to the errors that resulted in the over assessment? Neither the city nor any of the other benefiting jurisdictions have kept the extra tax revenues in escrow. Refunding taxes would require each responsible government to either scale back services to free up funding or increase the tax rate to yield the needed funding. In either case, this approach would result in taxing Detroiters today to compensate those that paid Detroit tax bills in the past.

Multiple challenges lie ahead with any solution that is proposed as a means of remediation. Whatever solution the city comes up with will not be perfect. There will still be winners and losers in this fight, but that does not mean the conversation towards remediation should not be had. This is an opportunity for the city government to learn from its mistakes and be held accountable so future generations do not suffer from the same blunders. As we continue into the decade and adjust to the new housing market and economic realities of the post-pandemic era, lessons of the past should inform viable policy solutions and accountable governmental action.

*Permission to reprint this blog post in whole or in part is hereby granted, provided that the Citizens Research Council of Michigan is properly cited.*

Permission to reprint this blog post in whole or in part is hereby granted, provided that the Citizens Research Council of Michigan is properly cited.

## RECENT POSTS

Michigan Ranks 40th in 2025 National Road System Condition Assessment—Unchanged from 2024

Changes in Federal Recommendations Could Make It Harder and More Expensive for Michiganders to Get Vaccinated

With SNAP and Medicaid in D.C.'s Crosshairs, Michigan's Universal School Meals Program May Become More Costly as a Result

Ecorse's High Tax Rates: A Showcase for Michigan's Ineffective Property Tax Rate Limits

The Long and Winding Road to a FY2026 State Budget

Stay informed of new research published and other Citizens Research Council news.

[ctct form="10424" show_title="false"]

ABOUT THE AUTHOR

**Detroit Bureau**

✉

Array

     

# The Detroit News
#### SERVING MICHIGAN SINCE 1873

**HOUSING**

# Detroit homeowners overtaxed $600 million

**Christine MacDonald / The Detroit News** Mark Betancourt / Special to The Detroit News

Jan. 9, 2020   Updated Jan. 11, 2020, 3:47 p.m. ET

Detroit overtaxed homeowners by at least $600 million after it failed to accurately bring down property values in the years following the Great Recession, according to an investigation by The Detroit News.

City Hall completed a state-ordered reappraisal of every residential property in 2017 to correct the problem, but the pain of its past mistakes remains with thousands who today face foreclosure over back taxes.

Of the more than 63,000 Detroit homes with delinquent debt as of last fall, more than 90% were overtaxed—by an average of at least $3,700—between 2010 and 2016, according to calculations by The News. The debt owed on about 40,000 of those homes is less than the properties were overtaxed over those seven years.

The inflated bills have been an added burden to homeowners in the poorest big city in the nation, and call into question a tax system that has foreclosed on a third of city properties since 2008.

► **INTERACTIVE: How much did Detroit overtax your home between 2010 and 2016? Search our online database to see an estimate**

Detroiter Anna Bolden knew something was wrong with her tax bill after she said she bought her west side brick bungalow in a tax foreclosure auction for $4,800 in 2011. That year her bill was $2,600, with the city taxing her as if the house was worth $57,000.

"My taxes shouldn't be this high," the 55-year-old first-time homeowner remembers thinking when getting her bills, "My house was only $5,000, why am I paying this money?"

A year later assessors valued it at $52,000, followed by $45,500 and $36,000 before the city finally lowered it to about $28,000 in 2017, after the reappraisal.

Meanwhile, according to the property data company ATTOM, the median home sale prices in Bolden's ZIP code were rising during the same time period, indicating the city's reductions likely were the correction of an inflated value.

"I went down (to city and county offices) to ask questions, but it's like everybody is giving you the runaround," she said. "It makes you feel like they are cheating you ... but what can you do?"

The News analysis, which was completed with help from Reveal from The Center for Investigative Reporting, is the first to estimate how much Detroit homeowners were overbilled. It indicates that Bolden's house was overtaxed by at least $4,100 between 2010 and 2016. She owes the Wayne County Treasurer about $4,600 in back taxes and worries she could lose it to foreclosure.

The News recalculated seven years of tax bills by substituting the home values the city put in place after its 2017 property-by-property reappraisal. That state-required review hadn't been done by Detroit officials in decades.

## Among the The News' findings:

♦ Of 173,000 Detroit homes reviewed, more than 92% were over-assessed between 2010 and 2016, and overtaxed by an average total of $3,800. Nearly 96,000 of those properties were taxed twice as much as they should have been in at least one of those years.

♦ Of the over-assessed homes, city records show about 79,000 properties have had the same owner since 2010, meaning those homeowners bore the full brunt

of the overtaxation. More are likely to have felt the impact because buyers often purchase homes with prior years of unpaid taxes they must pay.

♦ At least 59,000 homes that were overtaxed still have back taxes today—a total of $153 million, which includes interest and fees. Those same homes were overtaxed by at least $221 million over the seven years, according to the analysis.

▶**MORE:** How we reached our conclusions

State law mandates that assessments reflect the home's market value. Taxpayers can appeal, but housing advocates say the process is difficult to navigate for most owners, and many are not aware they have the option.

City officials have acknowledged their predecessors failed to fix the over-assessment problem quickly enough, but Mayor Mike Duggan said he can't correct those past mistakes, in part because current law doesn't allow it and the post-bankrupt city can't afford it.

"I think the rates should have come down sooner. But I dealt with what we had and moved as quickly as we could," Duggan said.

"Folks had a process by which they could appeal it. Those years are closed. I don't know any lawful way to go back and say to all the taxpayers of the city who did follow the process, 'We're going to raise your taxes to pay the taxes for people who didn't.'"

Thousands of homeowners are struggling with property tax debt despite low-interest repayment plans designed to help in Detroit.

Many who got inflated bills were unable to pay them, and now that debt is gathering interest. Others have fallen behind on recent taxes to pay past bills and avoid foreclosure. Wayne County forecloses after taxes go unpaid for three years.

About 28,000 of the overtaxed homes The News identified have been foreclosed

since 2013, the first year those inflated tax bills could have contributed to foreclosures.

For most owners, the home is their main financial asset. Tax foreclosure, which transfers a property's deed to the county for sale at auction, results in a total loss of that equity.

Duggan, first elected in 2014, and other leaders are pushing state legislation that could bring relief for low-income homeowners who qualify by wiping away large portions of their debt. And this week they announced they would raise the qualifying income limits to include more people.

But many, like homeowner Breck Stevenson, think the city should do more to help. His east side bungalow was overtaxed by at least $5,300—more than the $4,200 he owes in back taxes. He says his family's disability income would be too high to qualify them for the relief, even under the expanded eligibility rules.

"It's (the city's) responsibility," Stevenson said. "It was their mistake. It's their responsibility to take care of it and make things whole with the citizens."

## 'Legitimate way' to measure a past problem

The News' analysis was developed with input from former officials at the city, county and state levels and uses city data obtained through the Freedom of Information Act.

It also was only possible after staff at Reveal wrote code that scraped delinquent tax amounts from the county's website, data for which Wayne County Treasurer Eric Sabree wanted to charge The News $235,000.

The 173,000 properties The News analyzed did not include properties with Neighborhood Enterprise Zone tax breaks. For those properties, the city taxes the land and structures separately. Properties now owned by the government, including the Detroit Land Bank Authority, were also excluded. The goal was to

capture all currently viable homes that get tax bills.

Detroit's current City Assessor Alvin Horhn and Chief Financial Officer Dave Massaron told The News that they couldn't verify the $600 million overtax figure, but didn't dispute it.

Median sales of single-family homes citywide and in most ZIP codes were rising between 2010 and 2017, according to ATTOM data. Given that upward trend, the analysis presumes that when the city lowered an assessment in 2017, it was because the city's value was too high and not because the property's worth had decreased.

Massaron cautioned that Detroit's housing market varies by neighborhood, and some areas may have seen genuine losses in value over the time period analyzed by The News. Properties in those areas could appear in the analysis to have been overtaxed more than they were.

Officials acknowledged they don't have sufficient records to identify those properties.

Gary Evanko, Detroit's chief assessor from 2013 to 2016, called The News analysis a "legitimate way" to measure the past problem.

And Michigan State University professor Mark Skidmore, who was one of the researchers to first identify Detroit's over-assessment problem, believes the opposite trends of declining taxable values and rising sale prices likely means The News' method underestimates the problem.

"It is a useful, conservative estimate of over taxation," Skidmore said.

## 'Sad state of affairs'

Evanko was not surprised by The News' findings.

"Obviously, it was a sad state of affairs," he said. "In my guts, I knew that a lot of

people were paying more than they should have in the past."

Prior to the city's bankruptcy, Detroit's Office of the Assessor was plagued by a shortage of qualified staff and poor record keeping. After a Detroit News investigation drew attention to the problem in 2013, the State Tax Commission took oversight of the assessors office and ordered the reappraisal, which took more than two years and cost $5.85 million.

Evanko, whom the city hired to oversee the reappraisal, called the state of the city's data when he started in 2013 "deplorable."

Median home sale prices in Detroit had plummeted 87% by 2009, only a few years after the housing crash began, according to ATTOM. But city assessments didn't begin to reflect the market until nearly a decade later. The assessors made annual reductions during that time but applied them across large areas, and the reductions were too small. Duggan continued those broad reductions until the 2017 reappraisal was completed.

The ACLU of Michigan and the NAACP Legal Defense and Education Fund sued the Wayne County Treasurer to stop the tax auction in 2016, claiming the foreclosures were based on the city's "unlawfully" inflated tax assessments. State law requires that assessments not exceed 50% of a property's market value. The claims against the county were thrown out when a judge ruled the Michigan Tax Tribunal had oversight, not the court.

Property owners had the right to appeal their assessments, both at the city level and through the state Tribunal if necessary, but few did.

Evanko said Detroit couldn't have handled the volume of appeals if all of the Detroiters whose homes were over-assessed had challenged their assessments.

"There's just no way that this skeleton staff (could have), even on their best efforts, accommodate(d) the number of appeals that would be derived during that period of time," he said.

Case 2:25-cv-12417-BRM-EAS   ECF No. 1, PageID.25   Filed 08/05/25   Page 25 of 42

The former Chair of the State Tax Commission Doug Roberts said state and Wayne County officials knew there were problems with Detroit's numbers "but didn't know how bad" they were prior to 2013.

"No one paid as much attention as we should have," Roberts said. "We should have (intervened) sooner."

Once the scale of the problem was clear, the commission worked with the city and county to make sure the reappraisal was done, he said.

The News' analysis makes a "compelling case" and there should be an effort "to resolve the issues as equitably as possible."

"That's what government exists for," Roberts said.

## 'It should not be this hard'

Bolden never knew she could challenge her bill.

She borrowed money from her 89-year-old mother to avoid foreclosure and is now on a payment plan for the remaining $4,600.

Bolden said she and her husband's brick home on Asbury Park was the "worst house on the block" when they moved in and kicked out squatters in 2011. The inside was painted bright construction-cone orange, a hill of soiled diapers had collected in the backyard and a dead pit bull was in the garage.

Neighbors celebrated when they moved in.

But the string of foreclosure notices and the stress of trying to find help has often brought her "to tears," said Bolden, who is on disability and suffers from seizures.

"It should not be this hard," Bolden said. "That would hurt. Our first house, we lose it? What would we do then? ... There's nothing like having your own."

Case 2:25-cv-12417-BRM-EAS   ECF No. 1, PageID.26   Filed 08/05/25   Page 26 of 42

The tax foreclosure crisis helped drop the percentage of blacks who own their own homes in Michigan more than any other state, down to 40% in 2016 from just over half in 2000, according to a national report. Experts say Detroit once had one of the highest rates of black homeownership in the nation.

Bolden found out in December for the first time that she qualifies for the city's Poverty Tax Exemption, which waives property tax bills for those whose incomes qualify. She won't have to pay most of 2019's $1,500 tax bill. But even though she likely qualified in past years, the law doesn't allow the break to be applied retroactively.

Few homeowners have been aware of the tax break. More than 39,000 Detroit homeowners on average could qualify, based on U.S. Census data between 2012 through 2016, according to University of Michigan researchers. Last year, about 7,600 were granted the exemption, an increase of 30% from the previous year through improved outreach efforts.

▶ **GRAPHIC:** Home sales across the city dropped from their peak in 2006 to the low point in 2009, and they have slowly recovered since. Even as sale prices rose again, the city's assessors were lowering their estimated values in order to calculate tax bills more accurately.

## Detroit 'wronged a lot of people'

Duggan said the new "Pay As You Stay" legislation proposed in October is the government's best chance to reduce the impact of over-assessment on delinquent homeowners. The plan would waive interest and fees for those who qualify, and cap their total debt at no more than 10% of their home's taxable value.

Legislation to create the program passed easily in the Michigan House in December, and is in a Senate committee. Only homeowners who get the yearly Poverty Tax Exemption would be eligible for the program, which has waived either all or 50% of their taxes for each year they get it.

This week the city announced they have expanded the exemption program, which would also allow more families to qualify for "Pay As You Stay."

Now a family of four making $31,930 can get a 25% tax break on their current taxes and qualify for the debt relief, if the legislation is enacted.

Some housing activists have wanted more, including at least halting the tax auction until outstanding debt can be recalculated to reflect past home values. But city and county officials have dismissed that possibility.

"The city of Detroit, going into bankruptcy, did a lot of things wrong and wronged a lot of people," said Massaron, the city's CFO. In addition to homeowners being overtaxed, retirees lost benefits, and city services, from emergency response to streetlights, were lacking, he said.

And forgiving overtaxed residents who still have debt would be unfair to homeowners who paid their bills, city and county officials have argued.

"At the end of the day, a number of residents over the last decade have paid their taxes," Massaron said. "Over-assessed or not, they paid their taxes. And we need to be sensitive to the fact that those residents paid into the continued city operations."

"The bankruptcy was designed to be a reset so that the city could provide services at a particular level, and there is nothing in the plan of adjustment that provides for the repayment of any claim that was prior to that bankruptcy."

But Stevenson said he and others who were overtaxed should not be held responsible for the city's mistakes, either.

"If you were allowed to wipe it clean via the bankruptcy, then you should wipe it clean from the homeowners," he said.

*Research and reporting for this story was supported by the Fund for*

Case 2:23-cv-12417-BRM-EAS   ECF No. 1, PageID.28   Filed 08/03/23   Page 28 of 42

*Investigative Journalism.*

Detroit News reporter Christine MacDonald can be reached at 313-222-2396 or cmacdonald@detroitnews.com.

## How to apply for a Poverty Tax Exemption

The city of Detroit is taking new applications for the 2020 Poverty Tax Exemption. Click here for the application. For more information, call 313-224-3560 or email assessors@detroitmi.gov.

## Appeal your tax bill

Taxpayers can appeal their assessments during the February Assessors Review, Feb. 1-22. For more information, call 313-224-3035.

## Hear a radio story

Listen to a radio story about Detroit's tax debt crisis from Reveal from The Center for Investigative Reporting and PRX. The story, as well as the full Duggan interview with Reveal host Al Letson, was produced in collaboration with The Detroit News.

Listen online here. Or listen at 8 p.m. Sunday on Michigan Radio WUOM 91.7 FM, or at 2 a.m., 11 a.m. or 11 p.m. Tuesday on WDET 101.9 FM.

ACLU of Michigan                                    **Menu**      **Donate**

# GUEST BLOG: RACIAL DISCRIMINATION AND DETROIT'S TAX FORECLOSURE CRISIS

 By ACLUMICH_DVincent
JUNE 8, 2017 - 3:00AM

*By Guest Blogger, Professor Bernadette Atuahene*

This week the Coalition to End Unconstitutional Tax Foreclosures released a short animated video (https://www.youtube.com/watch?v=bD3vZYDYZsM) explaining the basis of the heart-breaking, government-created crisis that is causing tens of thousands of Detroiters to lose their homes.

Between 2011 and 2015, one in four Detroit properties were subject to property tax foreclosure. We have not witnessed this number of property tax foreclosures in American history since the Great Depression.

To stop the foreclosures, the ACLU of Michigan, NAACP Legal Defense Fund, and Covington & Burling LLP filed (https://www.aclumich.org/en/article/aclu-sues-wayne-county-end-racially-discriminatory-tax-foreclosures-detroit)a (https://www.aclumich.org/en/article/aclu-sues-wayne-county-end-racially-discriminatory-tax-foreclosures-detroit) lawsuit (https://www.aclumich.org/en/article/aclu-sues-wayne-county-end-racially-discriminatory-tax-foreclosures-detroit) last year against the City of Detroit and Wayne County.

**Read about the ACLU's Lawsuit to end racially discriminatory tax**

**foreclosures in Detroit.** (https://www.aclumich.org/en/article/aclu-sues-wayne-county-end-racially-discriminatory-tax-foreclosures-detroit)

Local government has caused this crisis. One of our most daunting research (http://www.freep.com/story/opinion/contributors/2016/09/01/detroits-tax-foreclosures-indefensible/89717644/) findings reveals that between 2009 and 2015, the Detroit Assessment Division assessed between 55 percent and 85 percent of homes at rates that violated the Michigan Constitution, which states that a property cannot be assessed at more than 50 percent of its market value.

More than 100,000 Detroit families have lost their homes due to these illegal tax foreclosure. African-Americans have been most deeply impacted.

**Learn more about some of the impacted residents.** (https://www.aclumich.org/en/taxforeclosures)

Equally as disturbing, thousands of poverty-stricken Detroiters are losing their homes for inability to pay taxes when they qualified for a poverty exemption that would have excused them from paying properly taxes in the first place. However, the City of Detroit made the process of obtaining a poverty exemption so convoluted that most qualified homeowners could not benefit from the program.

We need to spread the word about the tax foreclosure crises if we are going to stop it, so please share this video (https://www.youtube.com/watch?v=bD3vZYDYZsM) far and wide and make it go viral.

If you too want to be part of the resistance, the Coalition to End Unconstitutional Tax Foreclosures has a website with specific actions you can take: www.illegalforeclosures.org (https://l.facebook.com/l.php?u=http%3A%2F%2Fwww.illegalforeclosures.org%2F&h=ATPdp_rKdIKxzFTh6HZCKoP93WEj3yKTvmeMLdKDnyWo-H5uwrT5b1BIhqz3hHD94aKpp923XWtDieFw_AmmKQmMT-

pI_wD8JD7jqj1291PpCwk1j2Gh8mT2-8U&s=1).

The Coalition's first event is a People's Forum, which will be held on Saturday, June 17th 1-3:00 p.m. at the Wayne State Law School (free parking is available).  The People's Forum aims to educate the community about unconstitutional assessments in Detroit and create a restorative justice strategy to address the thousands of people who were foreclosed upon due to unconstitutional assessments.

*Bernadette Atuahene is a Visiting Professor of Law, Wayne State Law School; Professor of Law, IIT, Chicago-Kent College of Law; Research Professor, American Bar Foundation. Bernadetteatuahene.com (http:// bernadetteatuahene.com/)*


**Michigan Public** [n[p[r]]

Donate

# Detroit settles ACLU tax foreclosure lawsuit to keep impoverished residents in their homes

**Michigan Public | By Tracy Samilton**

Published July 4, 2018 at 7:17 AM EDT

✉

## DO NOT LOSE YOUR PROPERTY DUE TO UNPAID TAXES!

### www.treasurer.waynecounty.com

The Office of the Wayne County Treasurer has filed a Petition for Foreclosure in the Wayne County Circuit Court in accordance with Public Act 123 of 1999. The Petition requests the properties forfeited to the Wayne County Treasurer on March 1, 2017 and/or on March 1 of a prior year(s), for failure to pay 2015 and any prior forfeited taxes, interest, penalties, and fees, will **be foreclosed in favor of the Wayne County Treasurer.**

*Wayne County*

Detroit has settled a lawsuit filed by the ACLU, alleging the city made it too difficult for residents to learn about, and qualify for, a property tax exemption based on poverty.

Thousands of Detroiters in poverty paid property taxes they didn't owe because they didn't know they were exempt, and the city didn't tell them.  Many lost their homes at tax foreclosure auctions when they couldn't pay the taxes.

Michigan Public
**BBC World Service**

Residents had to physically go to City Hall and ask for the application to be mailed to their homes and the documentation required to prove eligibility was complicated and burdensome.

The settlement requires the city to notify owners of homes worth $95,000 or less about the poverty exemption in an annual mailing.  The application will be put online and it will be easier to prove eligibility.

For low-income residents whose homes are currently in tax foreclosure, they'll be able to keep their homes by paying $1,000, regardless of the amount of property taxes ostensibly due.  The payment can be spread over time.  But residents only have until July 13th to be approved, because the deadline to put homes into the annual county foreclosure auction is coming up soon.

Michael Steinberg with the ACLU says the settlement will likely prevent more than a thousand Detroiters from losing their homes in the foreclosure auction over the next three years.

"It's a life changing win for homeowners unfairly facing tax foreclosure," he says, "and it's a huge win for the city which will have fewer abandoned properties in its neighborhoods."

Under the terms of the settlement, Detroit will exercise its right of first refusal and buy the homes facing tax foreclosure now -- if owned by a low-income resident who applies in time – for the amount of the taxes owed to the county, which is about 60%. The city will forgo its own 40% of the taxes.

The United Community Housing Coalition will buy the homes from the city for the amount of the county taxes, and then make them available to the former homeowner for $1,000.  Philanthropic groups are providing the bulk of the money used by UCHC for the program, along with $275,000 from the city.

Steinberg says there will be a major outreach effort by community groups to let homeowners know about the program, with people going door to door at homes slated for tax foreclosure and auction in September.

Michigan Public
**BBC World Service**





## Tracy Samilton

Tracy Samilton covers energy and transportation, including the auto industry and the business response to climate change for Michigan Public. She began her career at Michigan Public as an intern, where she was promptly "bitten by the radio bug," and never recovered.

See stories by Tracy Samilton

**Michigan Public** n|p|r

Justice coverage that matters *to* you...

...made possible *by* you.

**DONATE**

Michigan Public
**BBC World Service**

Case 2:20-cv-12417-BRM-EAS ECF No: 1, PageID.35 Filed 08/05/25 Page 35 of 42

⌕     ⌕

## ⬡ UChicago News

# Inflated tax assessments spurred historic Detroit foreclosures, study finds

Ten percent of foreclosures, which deeply impacted poor, may have violated state law

**Jul 2, 2018**

foreclosures were conducted per 100,000 people—
drastically higher than any other city in the United
States, with St. Louis County a distant second with 197
out of 100,000 and Los Angeles County at only four per
100,000.

Berry and Prof. Bernadette Atuahene of Illinois
Institute of Technology Chicago-Kent College of Law
found that failure to properly assess properties and
conduct mandated annual site visits, led to systematic
violations of the Michigan constitution, which states
that no property can be assessed at more than 50 percent
of its market value.

The assessments are highly regressive, the study finds,
with properties in the bottom 20 percent of prices being
assessed at 7.5 times the actual sale price. Berry and
Atuahene further found that:

- The average home that was sold for $8,000 to
  $10,000 was valued by at nearly $50,000 by the
  assessor, while the average home that sold for
  $100,000 to $125,000 was valued at $87,000.
- In the bottom 10 percent of sale price, properties
  were assessed at more than 10 times their sale price,
  while in the top 10 percent, the average property

Case 2:25-cv-12417-BRM-EAS    ECF No. 1, PageID.37    Filed 08/05/25    Page 37 of 42

was assessed at only 39 percent of its sale price.

Combined with the regressive system, the poorest were the most hit, with 25 percent of tax foreclosures in the bottom 20 percent being due to unconstitutional assessments. While half of the properties in the bottom 20 percent experienced a tax foreclosure, only 37 percent would have if the constitution had been followed.

"Lower-priced homes are over-assessed at a higher frequency than higher-priced homes, which means that unconstitutional assessments—and subsequent foreclosures—have an outsized impact on the poorest Detroit residents," Berry said.

The study finds a strong association between unconstitutional tax assessments and tax foreclosures in Detroit, with roughly 10,000 of the 100,000 tax foreclosures that occurred in Detroit between 2011 and 2015 the result of unconstitutional assessments.

Case 2:25-cv-12417-BRM-EAS   ECF No: 1, PageID.38   Filed 08/05/25   Page 38 of 42

Following a series of studies that showed inequities in
Chicago-area property tax assessments, a UChicago
scholar in a new study (https://harris.uchicago.edu/
files/inline-files/
Atuahene%20and%20Berry%20Mar2018.pdf) estimates
that 10 percent of all foreclosures in Detroit were caused
by illegally inflated property tax assessments.

The research, co-authored by Prof. Christopher Berry of
the University of Chicago Harris School of Public Policy
(https://harris.uchicago.edu/), calls into question
whether roughly 10,000 foreclosures, predominantly
affecting its poorest residents, violated the Michigan
Constitution.

"Between 2011 and 2015, one out of every four
properties in Detroit, and 30 percent of Detroit homes,
went into foreclosure because of failure to pay property
taxes," said Berry, the William J. and Alicia Townsend
Friedman Professor at Harris Public Policy. "Our
research suggests that 10 percent of that unprecedented
number of foreclosures—that's 10,000 properties—
were based on illegally inflated tax assessments."

The extent of tax foreclosure in Detroit is
unprecedented. In 2015 alone, 3,500 property tax

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

County in which action arose: _____

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ramzu Yunus, Human Rights Policy officers, others

## DEFENDANTS

Detroit Land Bank Authority et al

**(b)** County of Residence of First Listed Plaintiff  Wayne
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Wayne
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ramzu Yunus

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question
  *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 865 RSI (405(g)) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | **FEDERAL TAX SUITS** | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | [ ] 871 IRS—Third Party 26 USC 7609 | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:

JUDGE _____  DOCKET NUMBER _____

DATE  8-5-25

SIGNATURE OF ATTORNEY OF RECORD

Ramzu Yunus

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?                      ☐ Yes
                                                                                   ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other        ☐ Yes
          court, including state court? (Companion cases are matters in which    ☑ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :

## CIVIL COVER SHEET (JS 44)

I. PLAINTIFF(S):

Name: Ramzu Yunus, individually and on behalf of all others similarly situated

Address: 20177 Washburn Street, Detroit, MI 48221

Phone: 313.293.7577 | Email: ramzu@protonmail.com


II. DEFENDANT(S):

City of Detroit; Detroit Land Bank Authority; Wayne County Treasurer; Detroit Police Department; John Does 1–50


III. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF: Wayne

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT: Wayne


IV. BASIS OF JURISDICTION (Place an 'X' in One Box Only):

[X] 3. Federal Question (U.S. Government Not a Party)


V. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only):

Plaintiff – Citizen of This State
Defendants – Government Entities


VI. NATURE OF SUIT (Place an 'X' in One Box Only):

[X] 440 – Other Civil Rights (housing discrimination, water shutoffs, due process, First Amendment, ICCPR)


VII. ORIGIN:

[X] 1. Original Proceeding


VIII. REQUESTED IN COMPLAINT:

✓ Injunctive Relief
✓ Compensatory & Punitive Damages

✓ Restitution
✓ Class Action under Fed. R. Civ. P. 23

IX. RELATED CASE(S) IF ANY:

None known at this time.

X. SIGNATURE OF ATTORNEY OF RECORD:

Ramzu Yunus (Pro Se)

Date: August 5, 2025